[No. B146918. Second Dist., Div. One. Feb. 27, 2002.]

FAYE A. SCHOENDORF, Plaintiff and Appellant, v.
U.D. REGISTRY, INC., et al., Defendants and Respondents.

**COUNSEL**

Faye A. Schoendorf, in pro. per., for Plaintiff and Appellant.

Enenstein, Russell & Saltz, Michael J. Saltz, Jason M. Russell and Darren S. Enenstein for Defendant and Respondent U.D. Registry, Inc.

Harvey A. Saltz, in pro. per., for Defendant and Respondent.

**OPINION**

**MALLANO, J.**—Defendant U.D. Registry, Inc. (UDR), is a consumer reporting agency that gathers information about unlawful detainer cases and sells it to landlords and other subscribers. Plaintiff Faye A. Schoendorf, a tenant, filed this action against UDR, alleging that it was providing misleading and incomplete information about her.

UDR moved to strike the complaint under section 425.16 of the Code of Civil Procedure, which prohibits "strategic lawsuits against public participation," better known by the acronym SLAPP. The trial court concluded that this action was a meritless attempt to chill UDR's constitutional rights and granted the motion.

On appeal UDR contends that it was not required to make any changes in plaintiff's report because the information she provided was not a matter of public record. We conclude that plaintiff made a sufficient showing that UDR should have modified her report even if the additional information was not contained in court files or similar sources. Accordingly, we reverse.

## I

### BACKGROUND

UDR provides a service to landlords known as "tenant screening." UDR typically provides its subscribers with consumer reports consisting of a standard credit report from one or more of the three major credit bureaus (Trans Union, Experian, and Equifax) and public record information that is gathered by its own employees from a review of court records regarding evictions, property damage cases, rent cases, foreclosures, and bankruptcies. UDR also obtains information directly from its subscribers concerning "good" tenants and "problem" tenants, and that information, too, is included in a tenant's report.

UDR has developed a standard form on which it reports unlawful detainers. The form includes the names of the parties, the date on which the unlawful detainer was filed, the court where it was filed, the case number, the address of the residence involved, the disposition of the case, and a "comments" section.

UDR's report on Schoendorf, dated May 28, 1997, showed two unlawful detainers. As stated in the report, the first suit was filed on April 16, 1992, and was resolved by dismissal. The comments section was left blank.

The second unlawful detainer, according to the report, was filed on April 12, 1995, and was also dismissed. The comments section read, "profane screaming & threatening others."

As to both unlawful detainers, the report accurately reflected the information found in the civil register of actions. The report also contained information from the complaint in the second unlawful detainer. The civil register indicated that the court file in the first unlawful detainer had been destroyed in December 1992. The file in the second case was scheduled for destruction in March 1998.

Schoendorf retained counsel to deal with UDR. By letter dated July 10, 1997, her attorney asked UDR to remove both unlawful detainers from the report or, in the alternative, to add clarifying information in the comments section. The letter discussed the suits separately, as follows.

"#1. You report a UD filed in April, 1992, bearing LA Municipal Court Case Number 211787. Your report [indicates] that the case was 'dismissed.' Your report contains no entries in the 'comment' section. The problem with

your report is that it simply does not illustrate the entire situation between Ms. Schoendorf and her former landlord.

"I am enclosing for your review some information concerning a dispute between Ms. Schoendorf and Total Real Estate Management[, the plaintiff in the unlawful detainer action]. Note that the story begins when Ms. Schoendorf reported a cockroach infestation and other maintenance and health problems in her rented unit to the Los Angeles Department of Health Services (report enclosed).

"After the problem was not resolved, Ms. Schoendorf filed her OWN affirmative lawsuit against Southern Pacific Land Group and Total Real Estate Management, among others (complaint enclosed).

"It was AFTER the filing of this lawsuit that the landlord filed its retaliatory UD. THIS IS THE UD THAT YOU HAVE REPORTED . . . .

"After the issues were joined in the action [filed by Ms. Schoendorf], the parties settled their differences by way of a written settlement agreement. Once again, you have failed to mention this. Moreover, the settlement was in Ms. Schoendorf's favor and resulted in a $5,000 payment to her by Southwestern and JR&K, the 'landlords' (document enclosed).

"Thereafter, the case was . . . dismissed . . . (document enclosed). To satisfy inquiring minds, I have even enclosed a copy of the $5,000 check to Ms. Schoendorf.

"Under the circumstances, it appears irresponsible for your agency to report the incident as a 'UD.' However, if reporting the UD is something you think is fair and equitable, then it would also be fair and equitable (and certainly appropriate) to address the foregoing in your 'comments' section.

"Demand is therefore made that you either eliminate the above-referenced 'UD' from your report or, at the least, include a fair and accurate statement of events in your 'comment section.' . . . [¶] . . . [¶]

"#2. You report a UD filed in April, 1995, bearing LA Municipal Court Case Number 501138. The plaintiff in that case was Scott Properties.

"As a preliminary observation, you will note that the UD was NOT for the 'non-payment' of rent, but was apparently filed because Ms. Schoendorf was accused of 'profane screaming & threatening others.' . . .

"In order to be fair to all concerned, I [am] enclosing a letter from . . . the manager of the subject property, wherein she states that the 'problem' was

apparently the working of a another tenant who did not get along with Ms. Schoendorf. As the letter explains, with the exception of this one disgruntled neighbor, there were no other complaints about Ms. Schoendorf.

"In addition, I am sending you a declaration from another tenant . . . who states without exception that Ms. Schoendorf was a quiet tenant who respected the rights of others.

"Also included are comments from [two other individuals], each of which supports Ms. Schoendorf's reputation as a quiet, polite and proper tenant.

"I don't know why Scott Properties decided to prosecute a UD against Ms. Schoendorf. I do know, however, that Ms. Schoendorf and Scott settled their differences and Ms. Schoendorf paid ALL of the agreed rent as a condition of the settlement (document enclosed). In fact, Ms. Schoendorf received a REFUND of her security deposit (document enclosed).

"On account of the foregoing, demand is therefore made that you eliminate this UD from your reporting, or, if you chose not to do so, that you report accurately and fairly the true situation in your 'comment section.' "

Schoendorf's attorney subsequently learned that UDR did not receive his letter. He sent another letter on September 18, 1997, saying: "I heard from Ms. Schoendorf that you have not received a letter which I addressed to your attention on July 10, 1997. . . . [¶] . . . I am sending you a copy of the letter of July 10, 1997 with all enclosures. I am sending the letter by Certified Mail so that there will be no confusion as to the delivery of the correspondence."

On May 18, 1999, UDR sent Schoendorf a letter, indicating that it had not found any errors in its report. UDR also sent some written materials and forms concerning her rights under California law.

Schoendorf retained new counsel. On August 19, 1999, he wrote to UDR, demanding that the unlawful detainers be removed from Schoendorf's report. By letter dated August 24, 1999, UDR's president, Harvey A. Saltz, responded, saying: "We have reviewed the file of Faye Schoendorf and find it to be correct. For that reason, we cannot comply with your request to delete records from her file. [¶] We add at this juncture that Ms. Schoendorf has been informed of her rights as a consumer vis-à-vis her records with us and has not taken appropriate steps to ameliorate her file. . . ." As Saltz later stated in a declaration, his August 24, 1999 letter "explained that UDR had verified that its records accurately reflected the information contained

within the Court's files and would thus not be complying with Plaintiff's attorney's demands."

On February 8, 2000, Schoendorf filed this action against UDR and Saltz (collectively UDR), alleging causes of action for negligence and "cancellation of instrument" (the "instrument" being the UDR report). Schoendorf alleged that the two unlawful detainers were baseless and that UDR had improperly reported them, causing damage to her reputation, credit history, and ability to find rental housing.

Schoendorf also alleged that the first unlawful detainer was filed to retaliate against her for having contacted the Los Angeles County Department of Health Services about substandard conditions at her residence. Attached to the complaint was a report from the department, dated February 21, 1992, citing the landlord for several health code violations, including infestation with cockroaches (living, dead, and egg deposits), lack of a smoke alarm, the need to regrout the sink and faucet in the bathroom, failure to clean the trash room, and the need to "rodent proof" the trash room door. Two months after the department's inspection, the landlord filed the unlawful detainer.

On May 25, 2000, UDR filed an anti-SLAPP motion in the present case, seeking to strike the complaint. UDR stated that the information in Schoendorf's report was obtained from court records. In UDR's words, the "report accurately mirrors the information contained in the Court's own file." UDR argued that Schoendorf's claims arose out of UDR's exercise of its First Amendment right to discuss matters that are related to litigation and to engage in constitutionally protected speech by the truthful reporting of matters contained in the public record. UDR also asserted that Schoendorf was not likely to prevail on her claims at trial. The motion was supported by a declaration from Saltz and several exhibits.

In her opposition to the motion, Schoendorf argued that the unlawful detainer suits were retaliatory, that UDR knew as much but took no action to correct the information in her report, and that, by providing incomplete and misleading information, UDR had violated the California Consumer Credit Reporting Agencies Act (Civ. Code, §§ 1785.1-1785.35) and the federal Fair Credit Reporting Act (15 U.S.C. §§ 1681-1681u). The opposition papers were based on declarations from Schoendorf and her attorney as well as various exhibits.

By order dated June 20, 2000, the trial court granted UDR's motion to strike the complaint. Schoendorf discharged her attorney and proceeded in

propria persona. In subsequent proceedings, the trial court awarded attorneys' fees and costs to UDR in the amount of $19,010. Schoendorf filed a notice of appeal.

## II

### DISCUSSION

"Litigation which has come to be known as SLAPP is defined by the sociologists who coined the term as 'civil lawsuits . . . that are aimed at preventing citizens from exercising their political rights or punishing those who have done so.' . . . [¶] . . . [¶]

"SLAPP suits are brought to obtain an economic advantage over the defendant, not to vindicate a legally cognizable right of the plaintiff. . . . [O]ne of the common characteristics of a SLAPP suit is its lack of merit. . . . But lack of merit is not of concern to the plaintiff because the plaintiff does not expect to succeed in the lawsuit, only to tie up the defendant's resources for a sufficient length of time to accomplish plaintiff's underlying objective. . . . As long as the defendant is forced to devote its time, energy and financial resources to combating the lawsuit its ability to combat the plaintiff in the political arena is substantially diminished. . . .

". . . Because winning is not a SLAPP plaintiff's primary motivation, defendants' traditional safeguards against meritless actions, (suits for malicious prosecution and abuse of process, requests for sanctions) are inadequate to counter SLAPP's. Instead, the SLAPPer considers any damage or sanction award which the SLAPPee might eventually recover as merely a cost of doing business. . . . By the time a SLAPP victim can win a 'SLAPP-back' suit years later the SLAPP plaintiff will probably already have accomplished its underlying objective. Furthermore, retaliation against the SLAPPer may be counter-productive because it ties up the SLAPPee's resources even longer than defending the SLAPP suit itself." (*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 815-817 [33 Cal.Rptr.2d 446], citations & italics omitted.)

The Legislature enacted the anti-SLAPP statute to protect defendants, including corporate defendants, from interference with the valid exercise of their constitutional rights, particularly the right of freedom of speech and the right to petition the government for the redress of grievances. (See *Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 862-864 & fn. 4 [44 Cal.Rptr.2d 46], criticized on another point in *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 477-478

[102 Cal.Rptr.2d 205]; *Conroy v. Spitzer* (1999) 70 Cal.App.4th 1446, 1448 [83 Cal.Rptr.2d 443].) The constitutional rights of a corporation, like those of an individual, can be chilled through an abuse of the judicial process. (See *Pacific Gas & Elec. Co. v. Public Util. Comm'n* (1986) 475 U.S. 1, 16 [106 S.Ct. 903, 911-912, 89 L.Ed.2d 1].)

## A. *Anti-SLAPP Motions*

■ In bringing an anti-SLAPP motion, "[t]he moving party bears the initial burden of establishing a prima facie showing [that] the plaintiff's cause of action arises from the defendant's free speech or petition activity. . . . If the defendant establishes a prima facie case, then the burden shifts to the plaintiff to establish ' "a probability that the plaintiff will prevail on the claim," ' i.e., 'make a prima facie showing of facts which would, if proved at trial, support a judgment in plaintiff's favor.' . . . In making its determination, the trial court is required to consider the pleadings and the supporting and opposing affidavits stating the facts upon which the liability or defense is based." (*Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 646 [49 Cal.Rptr.2d 620], citations & italics omitted.) " '[T]he [trial] court's determination of the motion cannot involve a weighing of evidence.' " (*Id.* at p. 654.)

"It is recognized, with the requirement that the court consider the pleadings and affidavits of the parties, the test is similar to the standard applied to evidentiary showings in summary judgment motions pursuant to Code of Civil Procedure section 437c and requires that the showing be made by competent admissible evidence within the personal knowledge of the declarant. . . . Averments on information and belief are insufficient. . . . As in a motion for summary judgment, the pleadings frame the issues to be decided." (*Church of Scientology" Wollersheim, supra,* 42 Cal.App.4th at p. 654, fn. omitted.)

"Generally, a party cannot simply rely on the allegations in its own pleadings, even if verified, to make the evidentiary showing required in the summary judgment context or similar motions . . . . The same rule applies to motions under [the anti-SLAPP statute]. Here, like motions under Code of Civil Procedure section 437c, the pleadings merely frame the issues to be decided. Similarly, an averment on information and belief is inadmissible at trial, and thus cannot show a probability of prevailing on the claim. . . . 'An assessment of the probability of prevailing on the claim looks to trial, and the evidence that will be presented at that time. . . . Such evidence must be admissible.' " (*Church of Scientology v. Wollersheim, supra,* 42 Cal.App.4th at p. 656, citations, italics omitted.)

Turning to the language of the anti-SLAPP statute, "[a] cause of action against a person arising from any act of that person in furtherance of the

person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (Code Civ. Proc., § 425.16, subd. (b)(1).)

"As used in [the statute], 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (Code Civ. Proc., § 425.16, subd. (e); see *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1117-1118, 1123 [81 Cal.Rptr.2d 471, 969 P.2d 564] [discussing types of statements covered by anti-SLAPP statute].)

## B. *UDR's Motion*

In its anti-SLAPP motion, UDR argued that this lawsuit interferes with its First Amendment right to disseminate information found in court files. (See *U.D. Registry, Inc. v. State of California* (1995) 34 Cal.App.4th 107 [40 Cal.Rptr.2d 228].) In statutory terms, UDR asserted that its report on Schoendorf was a "written . . . statement or writing made in connection with an issue under consideration or review by a . . . judicial body . . . ." (Code Civ. Proc., § 425.16, subd. (e)(2); see *id.*, subd. (b)(1).) As construed by the courts, the anti-SLAPP statute required UDR to "establish[] a *prima facie* showing [that] the plaintiff's cause of action arises from the defendant's free speech or petition activity." (*Church of Scientology v. Wollersheim*, *supra*, 42 Cal.App.4th at p. 646, italics added.)

On appeal, Schoendorf states, without elaboration or authority, that UDR did not make the requisite showing. ■ Of course, "parties are required to include argument and citation to authority in their briefs, and the absence of these necessary elements allows this court to treat appellant's [contentions] as waived." (*Interinsurance Exchange v. Collins* (1994) 30 Cal.App.4th 1445, 1448 [37 Cal.Rptr.2d 126].) "We will not develop the appellant['s] arguments for [her]." (*Dills v. Redwoods Associates, Ltd.* (1994) 28

Cal.App.4th 888, 890, fn. 1 [33 Cal.Rptr.2d 838].) We therefore assume that UDR has made a sufficient showing that this action comes within the ambit of the anti-SLAPP statute.

The burden thus shifts to Schoendorf, and she must—in the words of the statute—"establish[] that there is a probability that [she] will prevail on [her] claim." (Code Civ. Proc., § 425.16, subd. (b)(1).) The term "probability" is synonymous with "reasonable probability." (*Wilcox v. Superior Court, supra,* 27 Cal.App.4th at p. 825.) Put another way, the anti-SLAPP statute required Schoendorf to " 'make a *prima facie* showing of facts which would, if proved at trial, support a judgment in plaintiff's favor.' " (*Church of Scientology v. Wollersheim, supra,* 42 Cal.App.4th at p. 646, italics added; accord, *Dowling v. Zimmerman* (2001) 85 Cal.App.4th 1400, 1417 [103 Cal.Rptr.2d 174].)

■ Schoendorf contends on appeal that, by refusing to add clarifying information to her report, UDR violated the California Consumer Credit Reporting Agencies Act (Civ. Code, §§ 1785.1-1785.35) (CCRAA) and the federal Fair Credit Reporting Act (15 U.S.C. §§ 1681-1681u) (FCRA). The CCRAA states that "[w]henever a consumer credit reporting agency prepares a consumer credit report, it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." (Civ. Code, § 1785.14. subd. (b).) The FCRA contains a virtually identical provision (15 U.S.C. § 1681e(b)).

With respect to evidence that UDR violated the CCRAA and FCRA, UDR insists that there is none. As stated in UDR's brief: "The record clearly establishes that UDR did nothing more than report that which is contained in the public record regarding litigation. . . . [¶] [Schoendorf] may truly regret the fact that she failed to make sure that the public record reflected her version of the facts, however, her regret does not change the fact that her version of the alleged facts are not within the public record and have not been adjudicated." And when Schoendorf's counsel wrote to UDR about adding clarifying information to the report, UDR refused to make any changes on the ground that the report accurately reflected the information found in court files.

The same theme was echoed by defense counsel at oral argument. In responding to a question about complying with Schoendorf's request to add information to the report, defense counsel said, "You're asking us to alter what's in the public record. . . . In order to avoid any subjectivity whatsoever, [UDR] limits its reports to that which is contained in the public record." Referring to the information that Schoendorf wanted to add, defense counsel stated, "What we have here are nonadjudicated facts."

We reject UDR's position for several reasons. For one thing, UDR does *not* limit its sources of information to the public record and adjudicated facts. As stated, UDR accepts information directly from *landlords* about good tenants and problem tenants and includes that data in its reports. (See also *Cisneros v. U.D. Registry, Inc.* (1995) 39 Cal.App.4th 548, 567 [46 Cal.Rptr.2d 233].)[1]

Yet, UDR would have Schoendorf penalized just because her version of the dispute did not become a matter of public record. But, as a practical matter, the civil register of actions reflects very little information provided by *either party*. The filing of an unlawful detainer and its disposition (for example, "dismissed") are the only material facts of mention. Short of a judgment in his or her favor, a tenant cannot convey anything even remotely favorable through the register of actions. In this case, for instance, the register did not reflect that the landlord in the first unlawful detainer action may have sought to evict Schoendorf because she reported health code violations to the county.

More important, UDR's reliance on a "public record" standard is completely at odds with its statutory duties as a credit reporting agency. As Division Four of this court stated in an earlier appeal in a different case: "UDR overlooks its broader obligations under the statutes as a credit reporting agency. Both [the] CCRAA and FCRA require 'maximum possible' accuracy. (Civ. Code, § 1785.14, subd. (b); 15 U.S.C. § 1681e(b).) This means that a report violates the statutes when it is *misleading or incomplete, even if it is technically accurate.* . . . '. . . Congress did not limit the Act's mandate to reasonable procedures to assure only technical accuracy; to the contrary, the Act requires reasonable procedures to assure "maximum accuracy." The Act's self-stated purpose is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit . . . in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. § 1681e(b). Certainly reports containing factually correct information that nonetheless mislead their readers are neither maximally accurate nor fair to the consumer who is the subject of the reports.' " (*Cisneros v. U.D. Registry, Inc., supra,* 39 Cal.App.4th at pp. 579-580, italics added.)

Schoendorf argues that her UDR report, while technically correct and based on public information, is misleading and incomplete. As to the first

---

[1]At some point in the 1990's, UDR solicited information from subscribers by providing them with forms on which they were requested to describe each tenant, his or her treatment of the premises, and any other behavior relevant to the tenancy. The forms gave landlords sample responses like " 'Always paid rent late,' " " 'Changed jobs 7 times in 2 months,' " and " '$800 damage.' " (*Cisneros v. U.D. Registry, Inc., supra,* 39 Cal.App.4th at p. 567; see *id.* at p. 556.) We do not know if UDR still uses the same form.

unlawful detainer, she contends that, as shown by the declarations and exhibits she filed in the trial court, UDR's report should contain additional information, such as: (1) she contacted the county health department about the landlord's health code violations, (2) the department found serious violations upon inspection and issued a citation to the landlord, (3) the unlawful detainer was filed two months later, (4) she filed suit against the landlord for failure to correct the health problems, and (5) the litigation settled with a payment to her. Instead, the report simply notes that an unlawful detainer was filed and dismissed, leaving the reader to speculate about what actually happened—that perhaps Schoendorf skipped out owing three months' rent. As for the second unlawful detainer, Schoendorf asserts that the UDR report should reflect the statements of other tenants that she was a quiet, polite tenant.

With respect to damages, Schoendorf stated in her declaration: "At no time have Defendants, or either of them, taken any steps to delete the wrong and harmful information on my credit history, which they placed there concerning retaliatory u.d. actions. [¶] . . . [¶] . . . My credit has been severely ruined by the unlawful and inaccurate entries. I have suffered severe emotional distress and grief from this ordeal, lost sleep and employment opportunities, and my ability to rent other premises has been affected. I was left with no alternative but to file suit, when Defendants callously would not correct my credit history."[2]

Based on the foregoing analysis, we conclude that Schoendorf has made a prima facie showing of facts that would, if established at trial, support a judgment in her favor. We do not decide what information should have been added to her report, how it should have been worded, or what her remedies might be. We simply find that she made a prima facie showing on the merits of her claims. In response, UDR presents four legal arguments, all of which lack merit.

### 1. First Amendment

UDR argues that its decision about what to put in a report enjoys absolute protection under the First Amendment. Not so. Indeed, to accept UDR's argument would require that we declare the CCRAA and the FCRA unconstitutional—a challenge that UDR has not made and we do not reach.

Further, the case on which UDR relies, *U.D. Registry, Inc. v. State of California, supra,* 34 Cal.App.4th 107, does not afford UDR unreviewable

---

[2]UDR did not make any proper objections to the admissibility of Schoendorf's evidence. (See Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2001) ¶¶ 9:63, 9:98, pp. 9(I)-29, 9(I)-56.)

discretion in determining the contents of its reports. Quite the opposite. In that case, the court recognized that "[t]he state can, and does, provide the means to 'open the channels of communication' by affording the consumer the right to dispute inaccurate information in a credit report, seek a reinvestigation of the accuracy of information, and provide a brief statement explaining any unresolved disputed information to be included in any credit report the agency issues about the consumer. (§ 1785.15, subd. (f).) In this way, the state's concerns regarding the effect of the information upon its recipients are served without violation of the First Amendment." (*U.D. Registry, Inc. v. State of California, supra*, 34 Cal.App.4th at p. 116.)

Here, Schoendorf seeks a meaningful opportunity to dispute arguably inaccurate information in her UDR report and to provide a statement explaining unresolved disputed information. The First Amendment is not violated by requiring UDR to accommodate her requests. In short, UDR does not have a constitutional right to report half-truths.

## 2. *Litigation Privilege*

UDR contends that the "litigation privilege" (Civ. Code, § 47, subd. (b)) protects its decisions about the contents of its reports. In general, the litigation privilege precludes liability for communications made in any proceeding of a legislative, judicial, or official nature, and in proceedings where a writ of mandate is sought. (Civ. Code, § 47, subd. (b).)

■ "The principal purpose of [the litigation privilege] is to afford *litigants and witnesses* . . . the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions. . . . [¶] . . . [¶]

"[I]n immunizing *participants* from liability for torts arising from communications made during judicial proceedings, the law places upon *litigants* the burden of exposing during trial the bias of witnesses and the falsity of evidence, thereby enhancing the finality of judgments and avoiding an unending roundelay of litigation, an evil far worse than an occasional unfair result." (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 213-214 [266 Cal.Rptr. 638, 786 P.2d 365], citations omitted, italics added.) " 'In other words, the litigation privilege is intended to encourage *parties* to feel free to exercise their fundamental right of resort to the courts for assistance in the resolution of their disputes, without being chilled from exercising this right by the fear that they may subsequently be sued in a derivative tort action arising out of something said or done in the context of the litigation. . . .' " (*Aronson v. Kinsella* (1997) 58 Cal.App.4th 254, 262 [68 Cal.Rptr.2d 305], italics added.)

██ "In furtherance of the public policy purposes it is designed to serve, the privilege . . . has been given broad application. Although originally enacted with reference to defamation . . . , the privilege is now held applicable to any communication, whether or not it amounts to a publication . . . , and all torts except malicious prosecution. . . . Further, it applies to any publication required or permitted by law in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made outside the courtroom and no function of the court or its officers is involved. . . ." (*Silberg v. Anderson, supra,* 50 Cal.3d at pp. 211-212, citations omitted.) The privilege may also apply to communications made in anticipation of litigation, depending upon the circumstances. (*Rubin v. Green* (1993) 4 Cal.4th 1187, 1194-1195 [17 Cal.Rptr.2d 828, 847 P.2d 1044]; *Nguyen v. Proton Technology Corp.* (1999) 69 Cal.App.4th 140, 145-151 & fn. 8 [81 Cal.Rptr.2d 392].)

"The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by *litigants or other participants* authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." (*Silberg v. Anderson, supra,* 50 Cal.3d at p. 212, italics added.) "Because the privilege applies without regard to malice or evil motives, it has been characterized as 'absolute.' " (*Brown v. Kennard* (2001) 94 Cal.App.4th 40, 45 [113 Cal.Rptr.2d 891]; accord, *Aronson v. Kinsella, supra,* 58 Cal.App.4th at pp. 261-266.)

We recognize that there may be circumstances where the litigation privilege protects a communication that is also the basis of an anti-SLAPP motion. (See *Briggs v. Eden Council for Hope & Opportunity, supra,* 19 Cal.4th at pp. 1115, 1121.) "Just as communications preparatory to or in anticipation of the bringing of an action or other official proceeding are within the protection of the litigation privilege[,] . . . such statements are equally entitled to the benefits of [the anti-SLAPP statute]." (*Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777, 784 [54 Cal.Rptr.2d 830].)

██ But in the present case, the pertinent communication—the UDR report on Schoendorf—was *not* made in preparation for or in anticipation of bringing an action or other proceeding. It was prepared for use by UDR's subscribers. And UDR was not a litigant or participant in the unlawful detainer cases.

As UDR sees it, the litigation privilege shields persons who make statements about past litigation in which they were not involved. Were we to give

the litigation privilege such broad application, it would—like UDR's First Amendment argument—render the CCRAA and FCRA meaningless by granting UDR blanket immunity. Thus, we conclude, as have other courts, that nonparticipants and nonlitigants to judicial proceedings are not protected from liability under the litigation privilege. (See *Wise v. Thrifty Payless, Inc.* (2000) 83 Cal.App.4th 1296, 1304 [100 Cal.Rptr.2d 437]; *LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 344-348 [60 Cal.Rptr.2d 539]; accord, Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial, *supra*, ¶ 1:609.5, p. 1-132; Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2001) ¶ 1:467, pp. 1-124.6 to 1-124.7.)

Finally, to the extent that the CCRAA and FCRA cannot be reconciled with the privilege, the CCRAA and FCRA, being more specific, prevail over the litigation privilege, which is more general. (See *Medical Board v. Superior Court* (2001) 88 Cal.App.4th 1001, 1017 & fn. 47 [106 Cal.Rptr.2d 381].)

### 3. *Statute of Limitations*

UDR states that Schoendorf's claims "are clearly barred by the applicable statute of limitations." That conclusory statement is nothing more than a passing reference. Accordingly, we decline to address it. (See *Krain v. Medical Board* (1999) 71 Cal.App.4th 1416, 1426 [84 Cal.Rptr.2d 586].)

### 4. *Personal Liability*

UDR's president, defendant Saltz, argues that he cannot be found personally liable for violations of the CCRAA or the FCRA. (See *Cisneros v. U.D. Registry, Inc.*, *supra*, 39 Cal.App.4th at pp. 581-583.) Even so, he does not explain why he could not be found liable on Schoendorf's claim of negligence. Absent an argument on that point, we cannot conclude that Saltz is an improper party. (*Interinsurance Exchange v. Collins*, *supra*, 30 Cal.App.4th at p. 1448.)

In sum, the trial court erred in granting UDR's motion to strike given that Schoendorf made prima facie showing on the merits of her claims. Because the motion was improperly granted, it follows that the award of attorneys' fees and costs cannot stand.

### III

### DISPOSITION

The order granting the motion of U.D. Registry, Inc., brought pursuant to Code of Civil Procedure section 425.16 is reversed. The orders awarding

attorneys' fees and costs to U.D. Registry, Inc., and Harvey A. Saltz are also reversed. Faye A. Schoendorf is entitled to costs on appeal.

Spencer, P. J., and Ortega, J., concurred.

A petition for a rehearing was denied March 28, 2002, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied June 12, 2002.