Filed 5/3/22  Dubrow v. Brocq CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| TERRY J. DUBROW, | |
| Plaintiff and Respondent, | G060450 |
| v. | (Super. Ct. No. 30-2020-01165246) |
| STEPHEN LE BROCQ et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from an order of the Superior Court of Orange County, Nathan R. Scott, Judge.  Affirmed.

Brown & Charbonneau, Gregory G. Brown, Mark M. Higuchi, and Joseph M. Dankert for Defendants and Appellants.

Russ August & Kabat, Stanton L. Stein and Diana A. Sanders for Plaintiff and Respondent.

\*          \*          \*

INTRODUCTION

After a plastic surgeon filed a petition to compel arbitration of a patient's malpractice claims, the patient's attorney made statements regarding the plastic surgeon's negligence to an online website. The plastic surgeon sued the attorney for defamation, and the attorney filed a special motion to strike the complaint under Code of Civil Procedure section 425.16. The trial court denied the special motion to strike, and the attorney appealed.

We affirm. While the fair report privilege (Civ. Code, § 47, subd. (d)) provides a complete defense to media reports of judicial proceedings, the attorney's statements are not protected.

FACTUAL AND PROCEDURAL HISTORY

I. *SCOGGINS SUFFERS INJURIES AFTER SURGERY; DUBROW FILES A PETITION TO COMPEL ARBITRATION OF SCOGGINS'S CLAIMS*

In June 2019, Sandy Scoggins travelled to California from her home in Texas to have a surgical consultation with plastic surgeon Dr. Terry J. Dubrow. At that time, Scoggins signed an arbitration agreement in which she agreed that "any claim arising out of or related to the medical treatment or service she received by Dr. Dubrow would be resolved exclusively by confidential binding arbitration." Scoggins also signed a high risk consent form, agreeing that the risks of her surgery were higher than normal, and that her chance of complications was as high as 35 to 40 percent.

In July 2019, Dubrow performed plastic surgery on Scoggins. Scoggins contends Dubrow performed the surgery negligently, causing her to suffer injuries. Scoggins retained attorney Stephen Le Brocq and the law firm of Le Brocq & Horner to represent her in a medical malpractice action against Dubrow.[1] On July 2, 2020,

---

[1] We will refer to Stephen Le Brocq and the law firm of Le Brocq & Horner collectively as Le Brocq.

Le Brocq provided notice of intent to sue to Dubrow, pursuant to Code of Civil Procedure section 364.  On July 16, 2020, Le Brocq sent a second, more detailed demand letter to Dubrow's attorney seeking $5 million in damages.  (The demand letter attached approximately 900 pages of photographic evidence. Although the demand letter appears in the appellate record, the 900 additional pages do not.)

On October 14, 2020, Dubrow filed a petition to compel arbitration of Scoggins's malpractice claims in the Orange County Superior Court, attaching as exhibits the arbitration agreement and the July 2 notice of intent, but not the July 16 demand letter.  In relevant part, the petition contains the following contentions:

"12.  On July 2, 2020, almost a year after her surgery, Ms. Scoggins sent Dr. Dubrow a Pre-Lawsuit Demand/C.C.P. §364 Notice of Intent to Commence Lawsuit letter alleging that Dr. Dubrow was negligent in providing her with medical treatment and care because he allegedly failed to diagnose and treat her injuries.

"13.  On July 16, 2020, Ms. Scoggins sent Dr. Dubrow a 901 page demand packet containing a pre-litigation settlement demand of $5,000,000.  The letter threatens that, should Dr. Dubrow not settle the claim, Ms. Scoggins will file a federal lawsuit 'so she can tell the world what happened to her.'

"14.  Dr. Dubrow vigorously denied the claims, rejected the demand and demanded that Ms. Scoggins arbitrate her dispute consistent with the parties' Arbitration Agreement, however, she refused.  Instead, she and her attorneys embarked on an extortion campaign, threatening Dr. Dubrow repeatedly that they will (1) report him to the California Medical Board for disciplinary proceedings, (2) file a lawsuit in a Texas federal court against him with an intent to 'tell the world,' 'the media' and 'anyone' about Ms. Scoggins' claims, (3) drag Dr. Dubrow's television show *Botched* (even though Ms. Scoggins' surgery had nothing to do with the show) in to the lawsuit, as well as his Rox Medical Center, his staff, and media companies with which he does business,

3

and (4) accuse him of falsifying Ms. Scoggins' medical records—if Dr. Dubrow does not agree to promptly pay their demand of $5,000.000.

"15. Ms. Scoggins' extortionate tactics demonstrate that she fully intends on ignoring the Arbitration Agreement in order to harass and attempt to harm Dr. Dubrow's livelihood and reputation with a media smear campaign that uses a public court filing as its vehicle. The truth of the matter is that Ms. Scoggins' surgery was conducted with the utmost professional care and attention. Nevertheless, Ms. Scoggins is free to assert her claims but in arbitration consistent with the parties' Arbitration Agreement."

## II. *LE BROCQ'S STATEMENTS TO THE MEDIA*

On October 8, 2020, online media outlet Page Six e-mailed Le Brocq stating that Dubrow had claimed in a legal filing that he was not negligent in his care of Scoggins, and that he was "being extorted." Page Six requested a comment from Le Brocq. Le Brocq e-mailed the following response to Page Six, which was quoted verbatim on Page Six's website on the same day:

"Ms. Scoggins went to Dubrow to receive a surgery that was supposed to change her life, and it did, but in the worst way imaginable. Scoggins was 'Botched by Botched.'

"Dubrow's operation was so incredibly incompetent that not only did our client's wounds tear open immediately after her six-figure surgery, but she also developed sepsis and nearly died from Dubrow's negligence on multiple occasions. On top of that, Dubrow left medical equipment used during the surgery in our client's body, presumably because he was rushing to complete the procedure to get to filming his TV show. A camera crew for Botched was rushing Dubrow to finish with our client's surgery since his show was about to start filming a new patient.

4

"It has taken more than a year's time and multiple surgeries before our client no longer had large, open wounds on her body left by Dubrow.

"Instead of doing the right thing and accepting responsibility for his gross incompetence, he makes claims of extortion. Our client's life was turned upside down and nearly taken by Dubrow, and he is attempting to suppress the truth of his incompetence with a confidential arbitration clause.

"Dubrow has released private patient information to the Media and made false claims of extortion in an attempt to distract the Public from the truth. The truth is Dubrow rushed a surgery, nearly killed an innocent woman, and guaranteed this woman's life will never be the same again. The world deserves to know he is not the renowned plastic surgeon he purports to be in Hollywood." Page Six identified Le Brocq as Scoggins's attorney and referenced Scoggins's threat to file a lawsuit against Dubrow for his alleged negligence.

Additionally, online media outlet TMZ reported that Dubrow claimed in his petition to compel arbitration that Scoggins threatened to file a federal lawsuit and also to report him to the medical board. TMZ also reported the following statements from Le Brocq regarding Dubrow's petition to compel arbitration: "Scoggins' attorney, Stephen Le Brocq, tells TMZ, 'Instead of doing the right thing and accepting responsibility for his gross incompetence, he (Dubrow) makes claims of extortion.' Le Brocq also claims Dubrow left surgical tools inside Scoggins and rushed to finish her procedure so he could get back to filming his TV show."

At oral argument on appeal, Le Brocq's attorney confirmed that Le Brocq had not reviewed a copy of Dubrow's petition for arbitration at the time he made the statements to Page Six and TMZ.

III. *SCOGGINS SUES DUBROW FOR MEDICAL MALPRACTICE*

On October 12, 2020, Le Brocq filed a medical malpractice lawsuit against Dubrow on Scoggins's behalf in federal court in Texas. As is relevant to the issues in this appeal, the federal lawsuit contains the following allegations:

"22. Scoggin[s]'s surgery with Dubrow took place on July 30, 2019. The surgery consisted of inner and outer thigh lifts. Scoggins planned to have Brachioplasty as well, but Dubrow had to record *Botched*, and his schedule did not have time for that procedure to be performed.

"23. Following Scoggins's surgery, while in the recovery room, E! Entertainment agents and employees entered with lights and cameras and scolded Scoggins to 'be quiet' because they were filming. Scoggins did not consent for non-medical personnel to be in the room with her, especially not a *Botched* crew with cameras.

"24. While Scoggins was in recovery, just moments after Dubrow left to start filming with *Botched*, the nurses attempted to assist Scoggins to sit up in her bed, and she felt a horrible stinging sensation on her back. Right above her buttocks, in the center of her back, her incision dehisced.[2] According to the nurse, Scoggins's incision line busted open six (6) inches as a result of Scoggins merely sitting up.

"25. This is something that has never happened to Scoggins ever—both pre- and post-Dubrow. The fact that she dehisced in recovery by only sitting up at a 45-degree angle was indicative of a lousy and rushed suture job by Dubrow.

"[¶] . . . [¶]

"28. Dubrow apologized for not being able to administer anything other than local anesthesia or being able to take Scoggins back to the Operating Room because

---

[2] "Wound dehiscence means the 'splitting open of a surgical incision.'" (*Tipton v. Campbell* (La. App. 4th Cir. 2008) 996 So.2d 27, 33, fn. 6; see *Jamison v. Debenham* (1962) 203 Cal.App.2d 744, 746.)

*Botched* was filming. Dubrow was very rushed and stated he would normally take Scoggins back to surgery, but 'he's filming' and they were 'waiting on him.' Instead of concentrating on fixing the initially rushed suture job, Dubrow rushed again so he could get back to filming his show.

"[¶] . . . [¶]

"42. Had this infection been caught and treated when it should have, Scoggins would not have ended up going septic on two separate occasions or have had five sections of her incision line bust open. The hospital and Dubrow had a duty to notify her of this; they did not.

"43. Later that evening, Scoggins fever spiked to 102 degrees, and she felt terrible. Around 10:00 pm, her sister called 911, and E.M.S. arrived and triaged her. They suggested Scoggins go to the hospital to be examined out of fear she was developing sepsis.

"[¶] . . . [¶]

"58. On August 30, 2019, Scoggins spiked another fever: this time to 103.3, and she was experiencing confusion as a result thereof. She was admitted into Methodist Clearlake hospital again for a 7-night stay.

"59. On September 2, 2019, Scoggins developed increased drainage from several of her wounds while in the hospital. The surgeon said they needed to go in and do a washout to clean out the bacteria. During this surgery, *the doctor had to remove foreign objects left behind from Dubrow's surgery*. Pathology indicated it was a 'tan and white synthetic mesh-like material.'

"60. The doctor was also able to do a deep wound culture. It came back positive for Escherichia coli and E.S.B.L. According to Scoggins' infectious disease doctor, this is transmitted in the Operating Room when a patient is open. Therefore, aside from the nasty and deadly infection Scoggins was never notified about, foreign objects were also left behind inside her body."

7

IV. *DUBROW SUES LE BROCQ FOR DEFAMATION; LE BROCQ FILES A SPECIAL MOTION TO STRIKE*

Dubrow immediately filed the present action alleging defamation and false light invasion of privacy due to Le Brocq's statements to Page Six and TMZ. Le Brocq filed a special motion to strike pursuant to Code of Civil Procedure section 425.16 as an anti-SLAPP lawsuit.[3] Following briefing and a hearing, the trial court denied the motion based on the following findings: (1) Le Brocq met its initial burden of showing that Dubrow's claims arose from protected conduct, and (2) Dubrow met his burden of showing a probability of prevailing on the merits of his claim. Le Brocq filed a timely notice of appeal.

DISCUSSION

I. *THE ANTI-SLAPP STATUTE AND THE APPLICABLE STANDARD OF REVIEW*

Section 425.16 provides for a special motion to strike "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (Code Civ. Proc., § 425.16, subd. (b)(1).) "The Legislature enacted the anti-SLAPP statute to protect defendants, including corporate defendants, from interference with the valid exercise of their constitutional rights, particularly the right of freedom of speech and the right to petition the government for the redress of grievances." (*Schoendorf v. U.D. Registry, Inc.* (2002) 97 Cal.App.4th 227, 235.)

---

[3] "SLAPP" is an acronym for "strategic lawsuit against public participation." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 57.)

The special motion to strike references only the statements to Page Six. Le Brocq does not address the statements to TMZ in the briefing in the trial court, or in the briefs on appeal.

8

"Anti-SLAPP motions are evaluated through a two-step process. Initially, the moving defendant bears the burden of establishing that the challenged allegations or claims 'aris[e] from' protected activity in which the defendant has engaged. [Citations.] If the defendant carries its burden, the plaintiff must then demonstrate its claims have at least 'minimal merit.'" (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1061; Code Civ. Proc., § 425.16, subd. (b).) We review the trial court's order denying the anti-SLAPP motion de novo. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325.)

In this case, there is no challenge to the trial court's finding that Dubrow's claims arise from protected activity. Therefore, we turn directly to the second prong of the test: whether Dubrow's defamation claims have at least minimal merit. Le Brocq contends that Dubrow's claims lack any merit because Le Brocq's statements are fully protected by the fair report privilege, Civil Code section 47, subdivision (d)(1).[4]

## II. *CIVIL CODE SECTION 47(D)(1)—THE FAIR REPORT PRIVILEGE*

"The fair report privilege 'confers an absolute privilege on any fair and true report in, or a communication to, a public journal of a judicial proceeding, or anything said in the course thereof.'" (*Healthsmart Pacific, Inc. v. Kabateck* (2016) 7 Cal.App.5th 416, 431 (*Healthsmart*); see Civ. Code, § 47, subd. (d)(1).) If the privilege applies, any reported statements are absolutely privileged, no matter what the defendant's motives were in making them. (*Healthsmart, supra,* at p. 431.) The privilege must be construed broadly. (*Ibid.*)

"'Fair and true'" refers to "the accuracy of the challenged statements with respect to what occurred in the judicial proceedings" rather than "the truth or accuracy of

---

[4] Le Brocq's motion also argued Dubrow's claims were barred by the litigation privilege, Civil Code section 47, subdivision (b). Le Brocq does not pursue this argument on appeal.

the matters asserted in the judicial proceedings." (*Healthsmart, supra*, 7 Cal.App.5th at p. 434.) The court is "not concerned with either the merits of [the] allegations or the truth of [the] statements to the media about plaintiffs, but rather the extent to which the attorneys' statements accurately conveyed the substance of the allegations made in the . . . complaint. [Citation.] Such accuracy is measured by the natural and probable effect the statements would have on the average person reading, viewing, or listening to the report." (*Ibid.*)

### III. *LE BROCQ'S STATEMENTS TO PAGE SIX AND TMZ WERE NOT A FAIR REPORT ON AN EXISTING JUDICIAL PROCEEDING*

Whether the fair report privilege can apply depends first on whether Le Brocq was commenting on an existing judicial proceeding. When Le Brocq made the statements to Page Six and TMZ, only one judicial proceeding was underway—Dubrow's petition to compel arbitration. That petition was very limited in scope. In it, Dubrow alleged that Scoggins had claimed Dubrow committed medical malpractice and was threatening to sue Dubrow in federal court unless Dubrow paid her $5,000,000. Dubrow also alleged that Scoggins had signed a contractual arbitration provision before her surgery, and that the malpractice contentions must therefore be decided by an arbitrator. The statements by Le Brocq to Page Six and TMZ, in contrast, pertain to a proceeding that had not yet been commenced. Moreover, the statements contained information well outside the scope of the arbitration petition, which Le Brocq had not even reviewed at that time. Therefore, Le Brocq's statements were not a fair report on a judicial proceeding.

In *Healthsmart*, the court was considering whether the attorneys' statements accurately conveyed the substance of the allegations in the underlying complaint. (*Healthsmart, supra,* 7 Cal.App.5th at p. 434.) "An attorney may not, however, make defamatory allegations in a complaint and then report the same alleged

10

facts, *as facts*, to the media with impunity. This is because the fair report privilege protects reports and communications '*of* . . . a judicial . . . proceeding, or . . . *of* anything said in the course thereof.' [Citation.] That is, the statements are privileged if they are fair and true reports *about the proceedings* or of what was *said in the proceedings*. [Citations.] There is thus a critical difference between communicating to the media what is alleged in a complaint and communicating the alleged facts without reference to the complaint. More particularly, the attorney defendants in this case are protected from liability under the fair report privilege in informing the news media that they have alleged that plaintiffs used counterfeit screws in spinal surgeries and were part of a scheme that supplied prostitutes, but they are not protected if they informed the media that such facts were true. The issue is whether the average viewer or listener of the media reports would understand the attorneys' statements as communications about the . . . complaint (which would be privileged) or as facts (which would not)." (*Id.* at pp. 435-436.)

In *Healthsmart, supra*, 7 Cal.App.5th at page 436, the attorneys being sued for defamation were identified in the reports as attorneys for the plaintiff in the underlying lawsuit. In the television report the attorney's initial statement referenced actions "'we allege in the complaint.'" (*Ibid.*) Throughout the report, the reporter referred to the lawsuit, and images of the complaint were shown. (*Ibid.*) The court concluded that although some of the defamatory material could have been understood as statements of facts, not allegations of facts, when the report was considered in its entirety and in context, any reasonable viewer would understand that the statements referred to allegations in the underlying complaint. (*Ibid.*) In a separate radio report, all statements by the attorney and the reporter were discussed as allegations or in the context of a lawsuit being filed. The court concluded these statements, too, would be understood as referring to the complaint's allegations. (*Ibid.*)

Dubrow correctly argues that the fair report privilege does not apply to the extent the statements are claimed to be related to Scoggins's settlement demand from her

11

July 16 letter as a history of the proceedings. A prelitigation settlement demand is covered by the litigation privilege if it relates to litigation that is contemplated in good faith and under serious consideration. (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1251.) We have, however, found no cases applying the fair report privilege to communications in furtherance of prelitigation settlement.

The Page Six story reported that Le Brocq was representing Scoggins. The story also referenced Scoggins's threat to sue Dubrow in federal court, but only in connection with Dubrow's claims that Scoggins and Le Brocq were attempting to extort him. Le Brocq's statements to Page Six do not accurately convey the substance of the allegations in Dubrow's petition. The reasonable reader would not naturally and probably understand that Le Brocq was reporting about claims in a legal proceeding.

The key to our analysis is that Le Brocq's statements to Page Six were not connected in any way to any judicial proceeding. An average reader would understand Le Brocq's statements as facts, and therefore the statements are not privileged.

IV. *LE BROCQ'S STATEMENTS DID NOT DESCRIBE THE HISTORY OF AN EXISTING JUDICIAL PROCEEDING*

Le Brocq argues that the statements were privileged because they discussed the circumstances and history of the judicial proceedings.[5] The statements to Page Six, however, do not meet the standards for a privileged statement regarding the history of the proceedings. (See *Glenn v. Gibson* (1946) 75 Cal.App.2d 649, 660 [article addressing

_____

[5] Dubrow argues that Le Brocq's argument that the fair report privilege protects the statements because they encompass a history of the proceedings is raised for the first time on appeal, and has therefore been forfeited. "We will not address arguments raised for the first time on appeal." (*In re Campbell* (2017) 11 Cal.App.5th 742, 756-757.) While the phrase "history of the proceedings" does not appear in Le Brocq's papers filed in the trial court, the concept is definitely included; therefore, we conclude the argument has been preserved for appeal.

filing of criminal complaint and later court proceedings was protected as history of the proceedings].)

The cases on which Le Brocq relies do not require a different result. In *Hayward v. Watsonville Register-Pajaronian and Sun* (1968) 265 Cal.App.2d 255, a newspaper article based, in part, on the plaintiff's rap sheet and the crime report, which had formed the basis of the defendant's arrest warrant and criminal complaint, was held to be privileged. (*Id.* at p. 259.) The article "was careful to attribute the reported information to police sources rather than stating it as a proven fact." (*Ibid.*)

In *Braun v. Chronicle Publishing Co.* (1997) 52 Cal.App.4th 1036, the court held that the fair report privilege protected a series of articles "detail[ing] the fact that the State Auditor was conducting an investigation . . . ; the conduct of that investigation and statements made by various persons affected by or concerned with the subject of the audit; the substance of the background reports and charges leading up to the investigation; and a summary of the findings that ultimately issued." The appellate court held the reports "constitute[d] a history of the investigative audit." (*Id.* at p. 1051.) Therefore the articles fell within the fair report privilege as "reports of 'public official proceedings.'" (*Ibid.*)

In *Dorsey v. National Enquirer, Inc.* (9th Cir. 1992) 973 F.2d 1431, the mother of Arnold Dorsey's (Engelbert Humperdinck) daughter asked the court to order Dorsey to obtain a life insurance policy naming his daughter as beneficiary based on her belief that Dorsey had AIDS. (*Id.* at p. 1433.) The National Enquirer obtained a copy of the mother's affidavit supporting the request, and published a story based on it. (*Ibid.*) The Ninth Circuit's opinion provides the following regarding the relevant portions of the article: "The one-page article quotes [the mother]'s affidavit twice and quotes [the mother] as saying: 'I never would have filed the court papers if I wasn't 100 percent convinced he has the AIDS virus.' Jordan Stevens, a private investigator hired by [the mother], is quoted as saying: [¶] [']Humperdinck is suffering from the AIDS virus. We

13

have stated that belief in court papers and it is based on an intensive investigation of the singer during the past five years.  [¶] He was tested positive for the AIDS virus in early 1985.  As stated in the court documents, he has had treatment for the AIDS virus at Sloan-Kettering hospital but our information is that the disease remains.[']" (*Ibid.*) Dorsey sued for defamation; the court held that the fair report privilege applied and barred the claim.  The court acknowledged that the privilege extends to statements that "'comprise a history of the proceedings,'" and that the National Enquirer's article detailed the circumstances and legal theories raised in the court proceeding.  (*Id.* at p. 1437.)

In *Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, the allegedly libelous article contained the following prefatory statement:  "'This article is based on court documents, depositions, and transcripts of the custody case.  It's also supported by the accounts of friends and relatives of Sipple's ex-wives.'" (*Id.* at pp. 245-246.)

In *Argentieri v. Zuckerberg* (2017) 8 Cal.App.5th 768 (*Zuckerberg*), on the same day that Facebook and its founder Mark Zuckerberg filed a malicious prosecution action, Facebook's general counsel provided a written statement to the press regarding the litigation.  Although the opinion does not quote the full statement, it does note that it "reported the allegations of the malicious prosecution *complaint*." (*Id.* at p. 790.)  The appellate court held "it would be anomalous to hold privileged the delivery to the press of the complaint—with its extended and more detailed allegations of Argentieri's purported wrongdoing—but not the delivery to the press of a mere summary that succinctly sets forth its gist." (*Id.* at p. 793.)

By contrast to these authorities, Le Brocq's statements to Page Six do not quote, reference, or rely on any judicial proceedings, and are expressed in terms of facts, not allegations. The only existing judicial proceeding was a dispute over arbitrability which did not allege the facts of the medical negligence action. His statements thus fail as

14

fair comment not because he neither referred to a complaint nor prefaced his comments as allegations in an existing proceeding, but because he had not made the allegations in an existing proceeding on which he could report.

<br>

DISPOSITION

The order is affirmed.  Respondent to recover costs on appeal.

<br>

ZELON, J.*

WE CONCUR:

BEDSWORTH, ACTING P. J.

SANCHEZ, J.

*Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.