[No. B077282. Second Dist., Div. Four. Apr. 21, 1995.]

U.D. REGISTRY, INC., Plaintiff and Respondent, v.
THE STATE OF CALIFORNIA, Defendant;
RUTH CISNEROS, Intervener and Appellant.

[No. B077283. Second Dist., Div. Four. Apr. 21, 1995.]

APARTMENT ASSOCIATION OF GREATER LOS ANGELES, Plaintiff
and Respondent, v.
THE STATE OF CALIFORNIA, Defendant;
RUTH CISNEROS, Intervener and Appellant.

108

## Counsel

San Fernando Valley Neighborhood Legal Services, Inc., David Pallack, Lew Hollman, Western Center on Law & Poverty, Richard Rothschild and Clare Pastore for Intervener and Appellant.

Sumner B. Cotton, Horvitz & Levy, Barry R. Levy, David M. Axelrad, Lisa Perrochet and Stephen L. Jones for Plaintiffs and Respondents.

## Opinion

EPSTEIN, J.—At issue in this case is "whether a State may completely suppress the dissemination of concededly truthful information about entirely lawful activity, fearful of that information's effect upon its disseminators and its recipients." (*Va. Pharmacy Bd.* v. *Va. Consumer Council* (1976) 425 U.S. 748, 773 [48 L.Ed.2d 346, 365, 96 S.Ct. 1817].) We decide, as did the United States Supreme Court, that the answer is "no."

The tension here is between the First Amendment right to free speech and the Legislature's desire to protect prospective tenants by limiting the information a credit agency may report regarding a tenant's involvement in unlawful detainer actions. (Civ. Code, § 1785.13, subd. (a)(3); all statutory references are to this code unless otherwise stated.) The trial court found the statute unconstitutional, and we affirm that ruling.

### Factual and Procedural Summary

The consolidated cases before us were tried on stipulated facts. Plaintiffs are the U.D. Registry, Inc. (UDR) and the Apartment Association of Greater Los Angeles (Apartment Association). The Apartment Association is a trade organization for members involved in the residential rental business. UDR gathers information regarding unlawful detainer cases from municipal and superior court files, and sells that information to subscribers, including the Apartment Association. Both plaintiffs are credit reporting agencies within the meaning of section 1785.13.

Section 1785.13, subdivision (a)(3), as amended effective January 1, 1992, provides that "No consumer credit reporting agency shall make any consumer credit report containing any of the following items of information: . . . [¶] (3) Unlawful detainer actions, unless the lessor was the

prevailing party. For purposes of this paragraph, the lessor shall be deemed to be the prevailing party only if (A) final judgment was awarded to the lessor (i) upon entry of the tenant's default, (ii) upon the granting of the lessor's motion for summary judgment, or (iii) following trial, or (B) the action was resolved by a written settlement agreement between the parties which states that the unlawful detainer action may be reported. In any other instance in which the action is resolved by settlement agreement, the lessor shall not be deemed to be the prevailing party for purposes of this paragraph."

Prior to the effective date of amended section 1785.13, it had been the practice of the Apartment Association, upon request by a member, to obtain unlawful detainer information from UDR regarding a prospective tenant and to provide that information to the member. The amendment to section 1785.13 made disclosure of such information by a credit reporting agency, and *only* by that form of business, unlawful.

UDR and the Apartment Association brought actions against the State of California challenging the validity of the amended statute and seeking to enjoin its enforcement. Injunctive relief was denied, and on appeal by the Apartment Association, Division Three of this court affirmed the denial in an unreported decision (*Apartment Association of Greater Los Angeles* v. *Lungren* (Dec. 14, 1992) B065163). Ruth Cisneros, a renter of housing in Los Angeles County who has been a defendant in unlawful detainer actions which were dismissed, was given leave to intervene in both actions. She is aligned with defendant State of California.

Following plaintiffs' unsuccessful motions for summary judgment, the two cases went to trial on stipulated facts. The court ruled that section 1785.13, subdivision (a)(3) is unconstitutional because it prohibits truthful reporting of "information contained in court files that are fully available to the public and which can be freely reported and copied by any other person, entity or member of the media." Judgment was entered, and intervener Ruth Cisneros filed timely notices of appeal in both cases. Defendant State of California has not appeared in the appellate proceedings. The two cases have been consolidated for this appeal.

## DISCUSSION

██ ██ We must first determine whether the speech in question is commercial or noncommercial speech. The distinction is important because, while both types of speech are protected under the First Amendment, " 'commercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values,'

and is subject to 'modes of regulation that might be impermissible in the realm of noncommercial expression.' [Citation.]" (*Board of Trustees, State Univ. of N.Y.* v. *Fox* (1989) 492 U.S. 469, 477 [106 L.Ed.2d 388, 401-402, 109 S.Ct. 3028].)

The test for identifying commercial speech is whether the expression at issue proposes a commercial transaction. (*Va. Pharmacy Bd.* v. *Va. Consumer Council, supra,* 425 U.S. 748, 762 [48 L.Ed.2d 346, 358-359]; *Spiritual Psychic Science Church* v. *City of Azusa* (1985) 39 Cal.3d 501, 510-511 [217 Cal.Rptr. 225, 703 P.2d 1119].) ▮ Applying this settled definition, it is clear that the expression in this case, truthful information[1] taken from public records regarding unlawful detainer defendants, does not propose a commercial transaction, and hence is not commercial speech. The fact that UDR sells the information does not transform it to commercial speech any more than the fact that a magazine or newspaper is sold makes its contents commercial speech. "Some of our most valued forms of fully protected speech are uttered for a profit." (*Board of Trustees, State Univ. of N.Y.* v. *Fox, supra,* 492 U.S. at p. 482 [106 L.Ed.2d at p. 405].)

The Supreme Court has considered the right to limit truthful reporting of legal proceedings in several cases. In *Cox Broadcasting Corp.* v. *Cohn* (1975) 420 U.S. 469 [43 L.Ed.2d 328, 95 S.Ct. 1029], the court described the issue as: "whether the State may impose sanctions on the accurate publication of the name of a rape victim, obtained from public records—more specifically, from judicial records which are maintained in connection with a public prosecution and which themselves are open to public inspection." (*Id.* at p. 491 [43 L.Ed.2d at p. 347].) The court held the statutory limitation to be invalid. "By placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served. Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media." (*Id.* at p. 495 [43 L.Ed.2d at p. 349].) The court noted that "[i]f there are privacy interests to be protected in judicial proceedings, the States must respond by means which avoid public documentation or other exposure of private information. Their political institutions must weigh the interests in privacy with the interests of the public to know and of the press to publish. Once true information is disclosed in public court documents open to public inspection, the press cannot be sanctioned for publishing it." (*Id.* at p. 496 [43 L.Ed.2d at p. 350], fn. omitted.)

---

[1] We emphasize that this case concerns truthful speech, not false speech. (Cf. *Dun & Bradstreet, Inc.* v. *Greenmoss Builders* (1985) 472 U.S. 749 [86 L.Ed.2d 593, 105 S.Ct. 2939].)

In *Smith* v. *Daily Mail Publishing Co.* (1979) 443 U.S. 97 [61 L.Ed.2d 399, 99 S.Ct. 2667], the court held unconstitutional a West Virginia statute making it a crime for a newspaper to publish the name of any minor charged as a juvenile offender without the written approval of the juvenile court. Two newspapers learned of a shooting, allegedly perpetrated by a fourteen-year-old. They acquired this information by routine monitoring of the police band radio frequency. In violation of the statute, they published articles about the incident, including the alleged attacker's name, without seeking or obtaining approval from the juvenile court. The state sought to justify the statute as necessary to protect the anonymity of juvenile offenders because publication of their names might encourage further antisocial conduct and cause them to lose future employment or suffer other consequences for a single offense. The court held that the state's asserted interest was not sufficient to prevail over the constitutional rights created by the First Amendment. The court added that, even if the statute did serve a state interest of the highest order, the law did not accomplish its stated purpose since it did not restrict the electronic media or any form of publication except newspapers from publishing the names of minors charged in a juvenile proceeding. (*Id.* at pp. 103-105 [61 L.Ed.2d at pp. 405-406].)

The court again considered "the sensitivity and significance of the interests presented in clashes between First Amendment and privacy rights" in *The Florida Star* v. *B.J.F.* (1989) 491 U.S. 524, 533 [105 L.Ed.2d 443, 455, 109 S.Ct. 2603]. In that case, a weekly newspaper published the name of a victim of a sexual assault which it had obtained from a publicly released police report. The paper was found civilly liable based on a Florida statute which made it unlawful to " 'print, publish, or broadcast . . . in any instrument of mass communication' " the name of a victim of a sexual offense. In overturning the statute, the court returned to its analysis in *Daily Mail*, in which it held: "[I]f a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." (*Smith* v. *Daily Mail Publishing Co., supra*, 443 U.S. at p. 103 [61 L.Ed.2d at p. 405].)

The court first noted "the overarching ' "public interest, secured by the Constitution, in the dissemination of truth." ' [Citation.]" (*The Florida Star* v. *B.J.F., supra*, 491 U.S. at pp. 533-534 [105 L.Ed.2d at pp. 455-456].) It then relied on several other considerations, including the fact that protection is afforded only to publication of information that is lawfully obtained. "To the extent sensitive information rests in private hands, the government may under some circumstances forbid its nonconsensual acquisition, thereby

bringing outside of the *Daily Mail* principle the publication of any information so acquired. To the extent sensitive information is in the government's custody, it has even greater power to forestall or mitigate the injury caused by its release. The government may classify certain information, establish and enforce procedures ensuring its redacted release, and extend a damages remedy against the government or its officials where the government's mishandling of sensitive information leads to its dissemination. Where information is entrusted to the government, a less drastic means than punishing truthful publication almost always exists for guarding against the dissemination of private facts." (*The Florida Star* v. *B.J.F.*, *supra*, 491 U.S. at p. 534 [105 L.Ed.2d at pp. 455-456].)

The court considered the fact that punishing the press for its dissemination of information which is already publicly available is relatively unlikely to advance the state's asserted interest. "[W]here the government has made certain information publicly available, it is highly anomalous to sanction persons other than the source of its release." (*The Florida Star* v. *B.J.F.*, *supra*, 491 U.S. at p. 535 [105 L.Ed.2d at p. 456].) The court also was concerned that self-censorship would result from a statute which punished the media for publishing certain truthful information. (*Ibid.*)

Among the flaws in the Florida statute was its facial underinclusiveness, which raised "serious doubts" about whether the statute was, in fact, serving the significant privacy interests the state invoked as justifying the limitation on speech. The statute prohibited the publication of identifying information in an " 'instrument of mass communication,' " but did not prohibit the spread of the information by any other means. "When a State attempts the extraordinary measure of punishing truthful publication in the name of privacy, it must demonstrate its commitment to advancing this interest by applying its prohibition evenhandedly, to the smalltime disseminator as well as the media giant. . . . Without more careful and inclusive precautions against alternative forms of dissemination," the court was unable to conclude that the Florida ban satisfactorily accomplished its stated purpose. (*The Florida Star* v. *B.J.F.*, *supra*, 491 U.S. at pp. 540-541 [105 L.Ed.2d at pp. 459-460].)[2]

These cases answer almost all the questions presented by our case. The information subject to the publication prohibition of section 1785.13, subdivision (a)(3) is lawfully obtained by UDR through its examination of court

---

[2]See also *Simon & Schuster, Inc.* v. *Members of New York State Crime Victims Bd.* (1991) 502 U.S. 105 [116 L.Ed.2d 476, 112 S.Ct. 501] (statute that imposes financial burden on speaker because of speech content is presumptively unconstitutional); *R.A.V.* v. *St. Paul* (1992) 505 U.S. 377 [120 L.Ed.2d 305, 112 S.Ct. 2538] ("hate crime" ordinance unconstitutionally underinclusive because coverage limited to speakers who express views on disfavored subjects).

records which are open to public inspection. The parties have stipulated that UDR truthfully reports the information obtained from these records. (See *Cox Broadcasting Corp.* v. *Cohn*, *supra*, 420 U.S. at pp. 495-496 [43 L.Ed.2d at pp. 349-350].)

Section 1785.13 is part of the Consumer Credit Reporting Agencies Act (tit. 1.6, § 1785.1 et seq.) That statute was enacted in 1975 "to require that consumer credit reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, hiring of a dwelling unit, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this title." (§ 1785.1, subd. (d).) Section 1785.13 limits the information which a consumer credit reporting agency can report, precluding reports of bankruptcies, lawsuits, satisfied and unsatisfied judgments, tax liens, criminal records or other adverse information if any of those events antedate the report by a certain number of years.

Section 1785.13, subdivision (a)(4) originally provided that a consumer credit reporting agency could not report "Unlawful detainer actions where the person against whom the action was filed was adjudged the prevailing party." It was amended in 1991 (Assem. Bill No. 1796) so that subdivision (a)(3) precluded the reporting of unlawful detainer actions "unless the lessor was the prevailing party." The report of the Senate Committee on Judiciary stated that the purpose of the bill "is to prevent a meritless eviction lawsuit from being included in a consumer credit report." The report includes the statement of the bill's sponsor that this amendment was necessary because existing restrictions on the use of information concerning a tenant's involvement in an unlawful detainer action were inadequate. Under then existing law, unlawful detainer information could not be included in a credit report when the tenant was adjudged the prevailing party, but it could be included if the eviction action was settled or the matter was dismissed by the landlord. "[I]nappropriate inclusion of information about unlawful detainer actions results in 'tenant blacklisting' and imposes an unfair and unnecessary hardship on tenants seeking rental housing."

Concern about the availability of rental housing for those needing housing, and particularly those facing eviction, is a valid and significant state interest. But it does not justify a ban on publication by credit reporting agencies of lawfully obtained truthful information contained in court records open to the perusal of everyone. The information is in the custody of the state. If the state is concerned about dissemination of this information, it has

the power to control its initial release. As explained in *Florida Star, supra,* the government may classify the information, establish procedures for its redacted release, and extend a damages remedy against the government if the government's mishandling of sensitive information leads to its dissemination. "Where information is entrusted to the government, a less drastic means than punishing truthful publication almost always exists for guarding against the dissemination of private facts." (491 U.S. at p. 534 [105 L.Ed.2d at pp. 455-456].)

Section 1785.13, subdivision (a)(3) contains the same flaw found in the *Daily Mail* and *Florida Star* cases—the restriction against dissemination is limited to one type of publication, thereby failing to achieve its purpose of protecting the subject from other modes of broadcast of the same information. In *Daily Mail,* the restriction applied only to newspapers; in *Florida Star,* it applied only to "any instrument of mass communication"; in our case, the restriction applies only to consumer credit reporting agencies. In all three instances, the information can be disseminated in countless other ways. No justification is advanced for limiting one form of dissemination while permitting broadcast of the same information by other methods.

Appellant argues that the Supreme Court cases we have discussed are inapposite because they deal with information of public significance, while a credit report is a matter of private interest between the speaker and its business audience. The view that credit reports involve a matter of only private concern is expressed in various ways in the plurality opinion in *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, supra,* 472 U.S. 749, a defamation case arising from an erroneous credit report of a bankruptcy filing. While the distinction may be significant in the area of defamation, it does not define the parameters of permissible regulation for truthful reporting.

Section 1785.13, subdivision (a)(3) seeks to limit the free flow of information for fear of its misuse by landlords. The Supreme Court addressed just such a situation in the context of commercial speech in the *Va. Pharmacy* case when it rejected Virginia's claim that the only way it could enable its citizens to act in their own best interests is to keep them from obtaining comparative price information: "There is, of course, an alternative to this highly paternalistic approach. That alternative is to assume that this information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them. . . . It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us." (*Va. Pharmacy Bd.* v. *Va.*

*Consumer Council, supra,* 425 U.S. 748, 769-770 [48 L.Ed.2d 346, 362-363]; *Linmark Associates, Inc.* v. *Willingboro* (1977) 431 U.S. 85, 96-97 [52 L.Ed.2d 155, 164-165, 97 S.Ct. 1614].)

If such a "paternalistic approach" is impermissible for commercial speech, it is certainly improper for more highly protected noncommercial speech such as that limited by section 1785.13, subdivision (a)(3). The state can, and does, provide the means to "open the channels of communication" by affording the consumer the right to dispute inaccurate information in a credit report, seek a reinvestigation of the accuracy of information, and provide a brief statement explaining any unresolved disputed information to be included in any credit report the agency issues about the consumer. (§ 1785.15, subd. (f).) In this way, the state's concerns regarding the effect of the information upon its recipients are served without violation of the First Amendment.

As suggested by several of the opinions we have discussed, there are any number of things the state may lawfully do to protect renters who are subject to or who have suffered an eviction. What it cannot do is to act in violation of the Constitution. That is the effect of section 1785.13, subdivision (a)(3), the statute before us. We conclude it violates the First Amendment, and therefore is unconstitutional. The trial court was right to so declare.

### DISPOSITION

The judgment is affirmed.

Woods (A. M.), P. J., and Vogel (C. S.), J., concurred.

Appellant's petition for review by the Supreme Court was denied August 17, 1995. Lucas, C. J., and George, J., were of the opinion that the petition should be granted.