[Nos. B179537, B181354. Second Dist., Div. Four. Apr. 27, 2006.]

ARP PHARMACY SERVICES, INC., Plaintiff and Appellant, v. GALLAGHER BASSETT SERVICES, INC., et al., Defendants and Respondents.

1308

1310

## Counsel

The Law Offices of Armond Marcarian, Armond Marcarian; The Law Offices of Janet R. Randle and Janet R. Randle for Plaintiff and Appellant.

Jones Day, Steven B. Katz, John S. Sasaki and Sue J. Stott for Defendants and Respondents.

Bill Lockyer, Attorney General, Albert Norman Shelden, Assistant Attorney General, and Ronald A. Reiter, Deputy Attorney General, as Amici Curiae.

**OPINION**

**EPSTEIN, P. J.**—In this case, we conclude that the reporting requirement in Civil Code section 2527 violates the free speech rights of prescription drug claims processors. We also conclude the court properly granted respondents' special motion to strike and did not abuse its discretion in the award of attorney fees.

## FACTUAL AND PROCEDURAL SUMMARY

Civil Code section 2527, subdivision (b)[1] defines a prescription drug claims processor as "any nongovernmental entity which has a contractual relationship with purchasers of prepaid or insured prescription drug benefits, and which processes, consults, advises on, or otherwise assists in the processing of prepaid or insured prescription drug benefit claims submitted by a licensed California pharmacy or patron thereof."

Since January 1984, every prescription drug claims processor in California has been required to conduct or obtain "the results of a study or studies which identifies the fees, separate from ingredient costs, of all, or of a statistically significant sample, of California pharmacies, for pharmaceutical dispensing services to private consumers. . . . The determination of the pharmacy's fee made for purposes of the study or studies shall be computed by reviewing a sample of the pharmacy's usual charges for a random or other representative sample of commonly prescribed drug products, subtracting the average wholesale price of drug ingredients, and averaging the resulting fees by dividing the aggregate of the fees by the number of prescriptions reviewed. . . . This study or these studies shall be conducted or obtained no less often than every 24 months." (§ 2527, subd. (c).) "The study report or reports obtained pursuant to subdivision (c) shall be transmitted by certified mail by each prescription drug claims processor to the chief executive officer or designee, of each client for whom it performs claims processing services. Consistent with subdivision (c), the processor shall transmit the study or studies to clients no less often than every 24 months." (§ 2527, subd. (d).)

Section 2528 provides the legal consequences for violation of the statute: "[S]tatutory damages of not less than one thousand dollars ($1,000) or more than ten thousand dollars ($10,000) depending on the severity or gravity of

---

[1] All statutory references are to the Civil Code unless otherwise indicated.

the violation" may be imposed, "plus reasonable attorney's fees and costs, declaratory and injunctive relief, and any other relief which the court deems proper. Any owner of a licensed California pharmacy shall have standing to bring an action seeking a civil remedy pursuant to this section so long as his or her pharmacy has a contractual relationship with, or renders pharmaceutical services to, a beneficiary of a client of the prescription drug claims processor, against whom the action is brought . . . ."

In this action, appellant, a licensed California pharmacy, sued respondents as drug claims processors.[2] According to the allegations of the complaint, respondents repeatedly violated section 2527 by failing to provide the fee studies required by subdivision (c). Appellant alleged this conduct also constituted an unfair business practice within the meaning of Business and Professions Code section 17200. Appellant sought statutory damages for these violations, and disgorgement of profits.

The court sustained respondents' demurrer to the third cause of action for unjust enrichment, without leave to amend. Respondents moved for judgment on the pleadings directed at the remaining causes of action, on the ground that the reporting requirement was compelled speech which violated the federal and state Constitutions.[3] Respondents also brought a special motion to strike the complaint as a strategic lawsuit against public participation (SLAPP) pursuant to Code of Civil Procedure section 425.16. The court granted judgment on the pleadings, finding the reporting requirement in section 2527 violated the free speech clause of the California Constitution. (Cal. Const., art. I, § 2.) To avoid the necessity of a remand in the event the judgment on the pleadings was reversed on appeal, the trial court also granted the special motion to strike as an alternative ruling and awarded fees to respondents. The two appeals before us, No. B179537 from the judgment, and No. B181354 from the award of attorney fees, have been consolidated for oral argument and decision.

---

[2] Respondents deny they are "drug claims processors" within the meaning of the statute. Since this cause reaches us on appeal from the grant of judgment on the pleadings, we accept as true the factual allegations the plaintiff makes and give them a liberal construction. (*Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 516 [101 Cal.Rptr.2d 470, 12 P.3d 720] (*Gerawan I*).) Accordingly, we shall assume for purposes of this review that the allegation that respondents are drug claims processors is true.

[3] Respondents' motion did not challenge the requirement that drug claims processors conduct or obtain a study of pharmacy fees; the constitutional challenge was to the requirement that processors transmit the study to third party payors.

## DISCUSSION

### I

■ The trial court based its decision solely on the free speech clause of the state Constitution. Article I, section 2 of the California Constitution provides: "(a) Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." Article I's free speech clause enjoys existence and force independent of the First Amendment to the federal Constitution. (*Gerawan I, supra,* 24 Cal.4th at p. 489.) The state Constitution's free speech clause is at least as broad, and in some ways broader, than the comparable provision of the federal Constitution. (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 958–959 [119 Cal.Rptr.2d 296, 45 P.3d 243].)

■ "Because speech results from what a speaker chooses to say and what he chooses not to say, the right in question comprises both a right to speak freely and also a right to refrain from doing so at all, and is therefore put at risk both by prohibiting a speaker from saying what he otherwise would say and also by compelling him to say what he otherwise would not say." (*Gerawan I, supra,* 24 Cal.4th 468, 491; see also *Riley v. National Federation of Blind* (1988) 487 U.S. 781, 796–797 [101 L.Ed.2d 669, 108 S.Ct. 2667].) The prohibition against compelled speech encompasses compelled access, where a speaker is required to disseminate the speech of another, even if not required to endorse the content. (See *Pacific Gas & Elec. Co. v. Public Util. Comm'n* (1986) 475 U.S. 1 [89 L.Ed.2d 1, 106 S.Ct. 903]; *Miami Herald Publishing Co. v. Tornillo* (1974) 418 U.S. 241 [41 L.Ed.2d 730, 94 S.Ct. 2831].) "For corporations as for individuals, the choice to speak includes within it the choice of what not to say." (*Pacific Gas & Elec. Co. v. Public Util. Comm'n, supra,* 475 U.S. 1, 16.) "[T]his general rule, that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." (*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.* (1995) 515 U.S. 557, 573 [132 L.Ed.2d 487, 115 S.Ct. 2338].)

■ The United States Supreme Court has upheld constitutional challenges to compelled expression in two categories of cases: "true 'compelled speech' cases, in which an individual is obliged personally to express a message he disagrees with, imposed by the government; and 'compelled subsidy' cases, in which an individual is required by the government to subsidize a message he disagrees with, expressed by a private entity." (*Johanns v. Livestock Marketing Ass'n* (2005) 544 U.S. 550 [161 L.Ed.2d 896, 125 S.Ct. 2055, 2060].) Under this definition, section 2527, which requires

drug claims processors to obtain and transmit drug processing cost reports to its clients, is properly classified as "true" compelled speech, since it requires the processors to express specific content which they do not wish to present, rather than asking them to subsidize expression by another.

The Attorney General, appearing as amicus curiae pursuant to California Rules of Court, rule 13(c)(6), argues that the compelled speech doctrine has no application to section 2527 because the statute "is not in any constitutional sense a content-based regulation of speech seeking to advance or retard the expression of any viewpoint." "In deciding whether, under the First Amendment, a given regulation of speech or expressive activity is content based, and hence subject to strict scrutiny, or instead is content neutral, and hence subject to intermediate scrutiny (i.e., time, place, and manner analysis), the high court has stated that a restriction is content neutral if it is 'justified without reference to the content of the regulated speech.' [Citations.]" (*Los Angeles Alliance for Survival v. City of Los Angeles* (2000) 22 Cal.4th 352, 367–368 [93 Cal.Rptr.2d 1, 993 P.2d 334].)

In a case such as this one, where the issue is compelled speech rather than prohibited speech, the inquiry is whether the regulation requires transmission of specific content. Section 2527 requires drug claims processors to transmit specific information—drug processing costs—that the processors do not wish to send to their clients. The fact that it is essentially statistical information does not make it less entitled to First Amendment scrutiny. An analogous reporting requirement of statistical information was challenged in *Riley v. National Federation of Blind, supra*, 487 U.S. 781. In that case, professional charitable solicitors were required by North Carolina law to disclose to potential donors the average percentage of gross receipts actually turned over to charities by the fundraiser for all charitable solicitations conducted in the state during the previous 12 months. (487 U.S. at p. 786.) The Supreme Court explained, "Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech. We therefore consider the Act as a content-based regulation of speech." (*Id.* at p. 795.) For the same reasons, section 2527 is a content-based regulation of speech.

Relying on statements in the legislative history indicating that third party reimbursement policies are unfair and inequitable to participating pharmacists, appellant argues that the cost report required by section 2527 is outside the realm of constitutional protection because it is intended to correct "inaccurate" and "misleading" speech by the drug claims processors. The government may ban forms of communication which are likely to deceive the public or are related to illegal activity. (See *Central Hudson Gas & Elec. v. Public Serv. Comm'n* (1980) 447 U.S. 557, 563–564 [65 L.Ed.2d 341, 100 S.Ct. 2343]; *Gerawan I, supra*, 24 Cal.4th at p. 513.) There is no claim

of illegal activity in this case. And we find no indication in the cited legislative history that the claimed marketplace inequities, if they exist, result from inaccurate, false, or misleading speech (or silence) by drug claims processors. The speech compelled by section 2527 is protected speech.

Relying on *Johanns v. Livestock Marketing Ass'n, supra,* 544 U.S. 550 [125 S.Ct. 2055], appellant argues the processors' free speech rights are not burdened by section 2527, since the statistical reports need not be attributed to the processors. *Johanns* is factually and analytically distinguishable. It involved a challenge by beef producers to the compelled subsidy of the government-created Beef Board's promotional campaigns for beef and beef-related products. *Johanns* expressly distinguished compelled speech, which was not involved in that case, from compelled subsidy, which was involved. It also distinguished private speech, which was not involved, from government speech, which was: "Citizens may challenge compelled support of private speech, but have no First Amendment right not to fund government speech." (*Johanns, supra,* 125 S.Ct. at p. 2063.) The challengers argued the speech should not be deemed "government speech" because the message could appear attributable to them. The court discussed attribution of speech as a possible theory, but declined to express a view on the point. (*Id.* at p. 2065.) In this case, the issue is compelled speech by drug processors, not compelled subsidy of government speech. The discussion of attribution in *Johanns* does not affect this case.

■ Having concluded that section 2527 is a content-based regulation which implicates the drug claims processors' right to freedom of speech, we must next consider whether that right has been violated. (See *Gerawan I, supra,* 24 Cal.4th at p. 517.) For noncommercial speech entitled to full constitutional protection, a content-based regulation is valid "only if it can withstand strict scrutiny, which requires that the regulation be narrowly tailored (that is, the least restrictive means) to promote a compelling government interest." (*Kasky v. Nike, Inc., supra,* 27 Cal.4th at p. 952.) Commercial speech is entitled to less protection. (*Ibid.*) The constitutional validity of the regulation of commercial speech is tested under an intermediate standard, articulated by the United States Supreme Court in *Central Hudson Gas & Elec. v. Public Serv. Comm'n, supra,* 447 U.S. 557, 566, and adopted by the California Supreme Court. This intermediate scrutiny considers: "(1) 'whether the expression is protected by the First Amendment,' which means that the expression 'at least must concern lawful activity and not be misleading'; (2) 'whether the asserted governmental interest is substantial'; if yes to both, then (3) 'whether the regulation directly advances the governmental interest asserted'; and (4) 'whether it is not more extensive than is necessary to serve that interest.' " (*Gerawan Farming, Inc. v. Kawamura* (2004) 33 Cal.4th 1, 22

[14 Cal.Rptr.3d 14, 90 P.3d 1179] (*Gerawan II*), quoting *Central Hudson Gas & Elec. v. Public Serv. Comm'n, supra,* 447 U.S. at p. 566.)

Commercial speech was described in *Central Hudson* as "expression related solely to the economic interests of the speaker and its audience." (*Central Hudson Gas & Elec. v. Public Serv. Comm'n, supra,* 447 U.S. 557, 561.) The core notion of commercial speech is " 'speech which does "no more than propose a commercial transaction." ' " (*Bolger v. Youngs Drug Products Corp.* (1983) 463 U.S. 60, 66 [77 L.Ed.2d 469, 103 S.Ct. 2875]; see also *U.D. Registry, Inc. v. State of California* (1995) 34 Cal.App.4th 107, 111 [40 Cal.Rptr.2d 228].) Factors such as an advertising format, product references, and economic motivation may support characterizing written materials as commercial speech. (*Bolger, supra,* 463 U.S. at p. 67.) Inclusion of important public issues will not, by itself, change the characterization from commercial to noncommercial speech. (*Id.* at pp. 67–68.) Commercial speech "generally . . . is directed to an audience of persons who may be influenced by that speech to engage in a commercial transaction with the speaker or the person on whose behalf the speaker is acting." (*Kasky v. Nike, Inc., supra,* 27 Cal.4th 939, 960.) Commercial speech typically involves "statements about a product or service, or about the operations or qualifications of the person offering the product or service." (*Kasky,* at p. 961.)

The speech compelled by section 2527 is a report by drug claims processors to third party insurers on the average fees pharmacies charge for dispensing pharmaceutical drugs to private customers. Nothing about the content of this report proposes a commercial transaction between the speaker (the drug claims processor) and its audience (insurers, health plans, and other drug benefit providers). Nor does it promote the processors' business, which involves processing insured or prepaid claims for drug benefit providers. While the report may relate to the economic interests of the pharmacies by highlighting the dispensing fees charged to uninsured individuals, it does not affect the economic interests of the required speakers, who process insured drug claims for drug benefit providers. The speech compelled by section 2527 is not commercial speech.

A content-based regulation of noncommercial speech is valid under the First Amendment "only if it can withstand strict scrutiny, which requires that the regulation be narrowly tailored (that is, the least restrictive means) to promote a compelling government interest." (*Kasky v. Nike, Inc., supra,* 27 Cal.4th at p. 952.) We examine the governmental interest to be furthered by the statute.

Appellant suggests the fee study was necessary because drug claims processors arbitrarily set pharmacy dispensing fees. The record citation for the assertion that the fees are arbitrary is a statement by proponents of the

bill, in support of its passage: "Proponents point out that currently such reimbursements are arbitrarily determined, being usually based on substandard Medi-Cal fees." That statement does not support appellant's claim.

The record also does not support appellant's claim that processors provided false or misleading processing fee information which necessitated corrective legislative action. The information required by section 2527 is not necessary to protect the public health or safety, or even the public fisc; it is not aimed at protecting consumers, or insurers, from being misled. (See *United States v. United Foods, Inc.* (2001) 533 U.S. 405, 416 [150 L.Ed.2d 438, 121 S.Ct. 2334].) Nor is section 2527 aimed at eliminating possible unfair economic practices of drug claims processors by requiring them to disclose their own conflicts of interest and financial arrangements with third parties, as in *Pharmaceutical Care Management Ass'n v. Rowe* (1st Cir. 2005) 429 F.3d 294.

In a related argument, the Attorney General likens section 2527 to disclosure statutes aimed at protecting the general public. He argues that if we subject this "simple statistical reporting statute" to "the most exacting standard applied to the suppression or coerced utterance of ideas and beliefs, then a host of disclosure and reporting statutes would become immediately suspect," such as the required disclosure of financial information by corporations to shareholders or by condominium associations to its homeowners; the required disclosure of the contents of packaged foods; the requirement that car dealers and repair facilities provide information about where to lodge official complaints; and the requirement that creditors advise defaulting debtors of their legal rights. Each of these examples involves the dissemination of information necessary for the protection of the general public. Section 2527 is not in that category. Contrary to the apprehension expressed in the amicus curiae brief, nothing in this opinion places these sorts of consumer protection statutes at risk.

The government interest in this case is described in the legislative history of Assembly Bill No. 2044 (1981–1982 Reg. Sess.), the legislative vehicle by which section 2527 was enacted in 1982. (Stats. 1982, ch. 296, § 1, p. 936.)[4] As originally introduced in April 1981, Assembly Bill No. 2044 stated, in section 1: "The Legislature finds and declares as follows: [¶] Administrative and financial practices of certain nongovernmental third-party payors of pharmaceutical services have interfered with the patient's free choice of pharmacies and resulted in patients being denied service at their pharmacy of choice. Some pharmacies have individually decided not to participate in

---

[4] "[T]he legislative history of the statute and the wider historical circumstances of its enactment are legitimate and valuable aids in divining the statutory purpose." (*California Mfrs. Assn. v. Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836].)

third-party programs because of below cost, arbitrary, and inadequate compensation and the failure of programs to recognize the variation in patient services provided by pharmacies. Therefore, legislation is needed to assure patients the continued availability of pharmaceutical services by affording community pharmacies protection against coercive third-party administrative and financial practices." The measure provided that payments by a third party payor to a pharmacy for services to persons covered by a group plan "shall not be less than the usual charges of the pharmacy for the same or similar services to private consumers not covered by a group plan."

The bill went through several amendments. The requirement that third party payors pay the same amount as private consumers for pharmaceutical services was deleted, and the price study requirement which is at the heart of this case was added. The staff comment to the report of the Assembly Committee on Finance, Insurance, and Commerce explained the purpose of the study requirement: "It is the position of the sponsor of the bill that a pharmacist should be reimbursed by a third party payor according to the pharmacist's usual and customary charge, and that instead, a pharmacist is presently reimbursed according to the Medi-Cal reimbursement. The purpose of this bill is to require claims processors to present objective data on the range and percentiles of usual and customary charges of pharmacists in the hope that at a time in the future this information will become the basis for reimbursement."

In a letter to Governor Edmund G. Brown, Jr., urging that he sign Assembly Bill No. 2044 into law, the bill's sponsor, Assemblyman Bill Lancaster, wrote: "AB 2044 addresses a growing problem faced by California pharmacies—the tendency of private insurance or prepaid drug plans to pay pharmacies a fixed level of reimbursement that is usually pegged at or near the Medi-Cal fee. The plans often utilize independent claims processors which serve as intermediaries between the underwriters, on the one hand, and pharmacies on the other. [¶] An interim hearing of the Assembly Finance, Insurance and Commerce Committee last November established that because of antitrust constraints, pharmacists are unable to negotiate directly with the underwriters or processors. And neither the underwriters or processors conduct statistical analyses of pharmacy pricing levels prior to adopting a reimbursement policy. [¶] . . . [¶] I am hopeful that the legislation will serve to break the reimbursement logjam that has temporarily strained relationships between pharmacists, underwriters and claims processors. AB 2044 represents a legislative recognition that a problem exists and reflects my philosophy that the appropriate solution should involve a minimum of governmental intrusion and the creation of incentives for private parties to act fairly and responsibly toward one another." The bill was signed into law in June 1982.

The legislative history suggests that the governmental purpose in enacting section 2527 was to urge third party payors, by the use of statistical information, to compensate pharmacists at a fairer rate for providing pharmaceutical services to their insureds. While increased payment would benefit pharmacists, it also would potentially benefit insured consumers. The theory was that if insurers paid the pharmacies dispensing fees closer to the amount paid by uninsured consumers, pharmacies would be more likely to continue to contract with insurers, and insured consumers would be able to have their prescriptions filled at the pharmacies of their choice. It is far from clear that this is a compelling state interest, but for purposes of our free speech analysis, we shall assume that it is.

We turn to the second inquiry: is the regulation narrowly tailored to accomplish the compelling state interest. (*Pacific Gas & Elec. Co. v. Public Util. Comm'n, supra*, 475 U.S. at p. 19.) As the United States Supreme Court explained: "In considering this question, a court assumes that certain protected speech may be regulated, and then asks what is the least restrictive alternative that can be used to achieve that goal." (*Ashcroft v. American Civil Liberties Union* (2004) 542 U.S. 656, 666 [159 L.Ed.2d 690, 124 S.Ct. 2783].) Even where the speech in question is commercial speech, entitled to intermediate scrutiny, the regulation must advance the government's interest in a direct and material way. (*Central Hudson Gas & Elec. v. Public Serv. Comm'n, supra*, 447 U.S. 557, 566; *Gerawan II, supra*, 33 Cal.4th 1, 23.) That burden is not satisfied by mere speculation or conjecture; the party seeking to sustain the restriction must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree. (*Gerawan II*, at p. 23.)

Here, the legislative interest was to encourage insurers to pay pharmacists a fair rate for drug dispensing services. Section 2527 sought to accomplish this goal by requiring drug claims processors to provide statistical surveys of the customary charges for dispensing services for private-pay consumers. The bill's sponsor was "hopeful" the statistical studies would persuade insurers to increase their reimbursement rates to pharmacies to more closely match the private-pay fees. The mere transmission of the information, unaccompanied by any requirement that it be considered, utilized, or even read by the insurers, seems poorly designed to accomplish the state's goal.[5] We question whether there is a sufficient "fit" between this compelled speech and the legislative goal.

---

[5] The most direct method of obtaining fair reimbursement for pharmacists would be direct regulation of the rates for pharmaceutical dispensing services to insured consumers. While this would not impinge on the drug claims processors' right of free speech, it would have an obvious economic impact on insurers and pharmacies. The Legislature rejected that version of Assembly Bill No. 2044.

But assuming that there is, the second and more significant problem is that the regulation is not narrowly tailored to achieve the governmental interest. Again we find *Riley v. National Federation of Blind, supra*, 487 U.S. 781, 800 instructive. After concluding that the North Carolina law requiring professional fundraisers to disclose the percentage of charitable contributions actually turned over to the charities was a content-based regulation of speech, the Supreme Court considered the state interest used to justify the infringement of the First Amendment. The state interest was to inform donors "how the money they contribute is spent in order to dispel the alleged misperception that the money they give to professional fundraisers goes in greater-than-actual proportion to benefit charity." (*Id.* at p. 798.) The Supreme Court noted the existence of "more benign and narrowly tailored options" for achieving the state purpose. (*Id.* at p. 800.) "For example, as a general rule, the State may itself publish the detailed financial disclosure forms it requires professional fundraisers to file. This procedure would communicate the desired information to the public without burdening a speaker with unwanted speech during the course of a solicitation." (*Ibid.*)

In the case before us, the pharmacies, themselves or through business associations, could publish the dispensing fee studies and transmit them to insurers. In a memorandum to members of the Legislature supporting Assembly Bill No. 2044, the California Pharmacists Association explained that drug claims processors would not incur significant additional costs to comply with Assembly Bill No. 2044: "Their main duty is to periodically conduct <u>or obtain</u> the results of a study. Since reliable studies are periodically conducted by the California Pharmacists Association, study costs to the claims processors can be <u>zero</u>."

In his letter to the Governor, the sponsor of Assembly Bill No. 2044 suggested there is an antitrust restraint which prevents pharmacies from negotiating rates directly with the underwriters. But a restraint on direct negotiation is not a prohibition on gathering and reporting the statistical information called for by section 2527. Appellant cites us to *Northern California Pharmaceutical Ass'n v. United States* (9th Cir. 1962) 306 F.2d 379 as an illustration of the antitrust limitations on pharmacists. That case involved prosecution of a druggist and a pharmaceutical association for price-fixing, based on a suggested prescription-pricing schedule. We do not see how the dispensing fee report called for by section 2527 would be deemed a price-fixing agreement.

If, however, antitrust restrictions did preclude pharmacists from transmitting cost reports to the insurers, the reports could be sent to the government, which then could make them available to insurers, as well as the general

public. Whether the reports were transmitted by the pharmacists, the pharmaceutical association, or the government, the cost information could be disseminated to insurers "in the hope" of influencing the payment structure, without burdening the rights of drug claims processors not to speak on the subject. Requiring drug claims processors to provide the cost studies to insurers is not a narrowly tailored means of achieving a compelling state interest, nor does it have the least restrictive impact on the processors' right to free speech. It does not satisfy the strict scrutiny required for the regulation of speech.

■ We conclude that the reporting requirement in section 2527 and the related penalty and enforcement provisions in section 2528 violate the free speech provision of the California Constitution. Judgment on the pleadings was properly granted on this basis.

## II

The trial court also granted respondents' anti-SLAPP motion. This was intended as a fallback, alternative ruling, to be considered in the event this court reversed the grant of judgment on the pleadings. The purpose of the ruling was to avoid a remand. We find no error in the grant of judgment on the pleadings, and appellant argues the anti-SLAPP motion is therefore moot. In case No. B181354, appellant urges us to reverse the award of fees based on the grant of the anti-SLAPP motion.

■ Code of Civil Procedure section 425.16 provides in relevant part: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (*Id.*, subd. (b)(1).) An act in furtherance of the right of free speech includes "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (*Id.*, subd. (e).) A defendant who prevails on a special motion to strike under the statute is entitled to attorney fees. (*Id.*, subd. (c).)

This action arises from respondents' refusal to provide pharmacy fee reports to insurers, as required under section 2527. As we have discussed, the trial court held, and this court has concluded that the reporting requirement of section 2527 violates drug claims processors' free speech rights under the California Constitution. Their refusal to comply with the compelled speech requirement of the statute is an act in furtherance of respondents' right of free

speech in connection with an issue of public interest, within the meaning of Code of Civil Procedure section 425.16.

Once the moving party has established that the cause of action arises from an act in furtherance of the right of petition or free speech, the burden shifts to the plaintiff to demonstrate the probability that it will prevail on the merits. (*Zamos v. Stroud* (2004) 32 Cal.4th 958, 965 [12 Cal.Rptr.3d 54, 87 P.3d 802].) Appellant is unable to do so in this case, since the statute is unconstitutional and therefore unenforceable. The trial court had no choice but to grant the anti-SLAPP motion, and to award fees to respondents.

This is a troubling result, given that the action was brought under what appeared to be a lawful statutory scheme which required respondents to make reports, and gave appellant standing to seek a civil remedy for failure to comply. Yet the anti-SLAPP statute does not exempt such a private enforcement action from its scope. (Cf. Code Civ. Proc., § 425.16, subd. (d), which exempts from that section "any enforcement action brought in the name of the people of the State of California by the Attorney General, district attorney, or city attorney, acting as a public prosecutor.")

 Appellant argues the anti-SLAPP statute should not apply because the action was fully disposed of by the trial court's judgment on the pleadings, and rendered the special motion to strike moot. A plaintiff may not avoid liability for attorney fees and costs by voluntarily dismissing a cause of action to which an anti-SLAPP motion is directed. (*Pfeiffer Venice Properties v. Bernard* (2002) 101 Cal.App.4th 211, 218–219 [123 Cal.Rptr.2d 647].) Nor is the issue of attorney fees and costs pursuant to Code of Civil Procedure section 425.16 rendered moot by an involuntary dismissal after a demurrer is sustained without leave to amend. (*White v. Lieberman* (2002) 103 Cal.App.4th 210, 220–221 [126 Cal.Rptr.2d 608].) Similarly, a plaintiff cannot amend a pleading to avoid a pending anti-SLAPP motion. (*Sylmar Air Conditioning v. Pueblo Contracting Services, Inc.* (2004) 122 Cal.App.4th 1049, 1054–1055 [18 Cal.Rptr.3d 882].) In the absence of an applicable statutory exception, we reluctantly agree with these cases, and conclude that the grant of judgment on the pleadings did not render respondents' pending anti-SLAPP motion moot.

That brings us to the second appeal, in which appellant challenges the amount of fees awarded. Respondents requested $128,000 in fees, and submitted documentation to support that request. The trial court found that amount to be excessive, and reduced the award to $40,000. Given the complexity of this case and the quality of work performed by respondents, we find no abuse of discretion in that award.

## DISPOSITION

The judgment and order are affirmed. The parties are to bear their own costs on appeal.

Curry, J., and Willhite, J., concurred.